Good morning, counsel. Mr. Gibbs. Thank you. And thanks for adjusting your schedules. As long as you were here and we are here, it's better to start a little bit early. Thank you. Thank you. We're ready now. Good morning. My name is William Gibbs. I represent the appellant, Mr. Michael Cole. We've appealed the finding of guilty, maintaining that there was not sufficient proof based on the evidence presented to prove my client guilty of being on a reasonable doubt. Clearly, the main issue is did the evidence raise any reasonable doubt of the defendant's guilt and was the decision unreasonable in light of the facts? In this case, what we have is a situation which, according to the Morrison case, which I cited in the brief, is not the type of situation that the child abduction statute envisioned. My client was charged with intentionally concealing, removing, or detaining the child without the consent of the mother. There was no issue regarding paternity. They had had a 20-year relationship on and off. He had an active relationship with his child, saw the child almost every other day, sometimes there were five or six days a week, which was indicated in the transcript. She didn't give consent for him to come and take the child at 3.30 in the morning to go to breakfast, did she? The time is the issue. I think that's exactly correct. It's also the circumstances. He said when she opened the door, he says it didn't have to be this way, and then he grabs the child from the bedroom and takes the child without a blanket or any clothing out into the night on January 7th. Correct? It was the morning at 3.30, that's correct, and it was two hours probably earlier than he could have come. They said the morning. And was it unreasonable for him to go there at 3.30, which is what the judge found? Yes, it probably was. But does that mean he was intentionally removing the child from the mother as envisioned by the statute? And in this case, no. What we have is a circumstance where, yes, the circumstances under which he came and picked up the child were probably not well thought out. I would agree with that. But was that criminal? And the mother testified that he did not have permission to take the child at that time. Correct? The time was never discussed with them at all. That's correct. She did testify that on direct. That's very true. And she said on redirect, no, he did not have permission. No, I think the testimony Mr. Mahoney cross-examined her and what she said to him at that time was, the only issue you had was the time that was inconvenient or uncertain, but you did have an agreement that he could come pick up the child in the morning. And that's correct. He picked up the child and he took the child to breakfast. Aren't you really asking us to interpret the facts of the case as opposed to looking at the trial court's finding? The trial court found that he did not have permission to take the child. He knew he didn't have permission. He took the child without permission. But the court, I think, you know, just has to... What element is missing? What element from child abduction is missing here? First of all, I don't think that he had the, they proved that he had the intent to remove the child as envisioned by the statute. I don't think he... Don't his, isn't his behavior enough to satisfy the element of knowledge? I mean, ordinarily, in virtually every case, intent or knowledge is proven by circumstantial evidence. Very rarely do you have somebody say, well, I meant to shoot that person or I meant to take this item, I meant to break in. It's based upon the circumstances. The circumstantial evidence here, together with his statement, isn't it reasonable to infer for the trial court that he knew that he did not have permission when he said it didn't have to be this way and he takes the child? Isn't that reasonable? It's also reasonable to believe it didn't have to be where I was going to come get him at 3 o'clock in the morning. That's your argument. The trial court found that based upon the evidence, it was reasonable to conclude that the defendant did not have permission and he knew he didn't have permission to take the child. Actually, he believed there was an agreement, which the court wasn't well aware of because there was, there was testimony from the complaining witness that she did agree to that. Secondly, what happens then... for him to have the child that morning? And he has taken the child before. He was with them every day. This is the situation as in Morrison. Actually, the Morrison case is worse than this one. Because what he said to her in Morrison was, you're never going to see her again, see him again. And yet they still found that this wasn't the type of situation. He had come to pick up the child and she had moved out. And he went to a different home, not the one he was just at, not the one that they had been living in on and off for the last 20 years or having a relationship with for 20 years. But he went to the house and he just picked them up and took them and said, you're never going to see him again. And that is worse than what we have here. How old was the child in Morrison? He was young. He was younger. He was not two. I think he was older than two. But he was still, he was, it was a child. And how old was this child? A little over two, if I'm not mistaken. I think a year and a half. A year and a half. A year and a half. He was a baby. But he was in a twin bed from what she testified to. So I believe that it was closer to two. In any event, what he did is he picked up this child and he didn't say you're never going to see him again. He came there because that's what they had arranged. And I know the court believes that because of. . . It didn't have to be this way. He didn't ask for permission. He just went in and took the child, correct? Yes. And one of the circumstances when he did that, too, was she opened the door, she let him in. She didn't say you're not taking him. She didn't follow him outside. She didn't even go outside the house. She testified she didn't have time. It happened so fast. Did she answer the phone when he was calling her? No. And that is another circumstance that I think has to be taken into account. She testified that it was an hour and a half before he called, which would have made it roughly around four something. The police were there at that time. We don't know when she called the police. We don't know exactly how much time will last before the police got called or got there. But we do know she didn't answer the phone when he called while they were there, which would have eliminated this problem. He then calls back ten minutes later after the police are gone, and she says, where are you? I want you to bring the child home. And he does. Those facts and circumstances had to be taken into account with respect to his intent as well. And it's the totality of everything, and the fact that he did bring them back ten minutes later after she said and then told her when we were at McDonald's having breakfast, like I said. And they were only gone for a period of two and a half to three hours, between 3.30 or so and about just before 7, I believe she testified to. So they weren't gone an extended period of time. He did try to contact her and tell her what was going on, but she didn't answer. Had she done that at that time and the police were still there, he would have come home. It would have been no different. This is not a situation, and again referring to Morrison, I just want to reiterate, it's not a situation where he threatened to take them. He just said it didn't have to be this way, which means we could have been cordial, I could have stayed here. It could have meant a number of things. And going back to what you indicated with respect to the judge and his conclusion, he did make that finding that she didn't consent, but I don't believe that's supported by the testimony. Although she said on direct, pursuant to a direct question by the prosecutor, did you consent to have him taken? And she said not at that time. And he said, did you ever have any concerns about the defendant spending time with the child? And she said, my concern was our issues, not so much with him being with the baby. That's correct. And as I indicated in my brief, he was described to her as a good father. He was attentive. He supported the child, both emotionally, physically, and financially. And all those things are the things that Morrison took into account. And there's a lack of... Would you agree we're not bound to follow Morrison? No, we're not bound. Although we can be guided by him. I understand. It's not this district. I understand that. And I think the state's going to argue that they didn't follow the law, that they ignored the statute, which they argued in their brief. However, I don't believe that it's the case. I think every case has to be examined on its own merits and determined whether or not that statute fits the situation. Let's go on to a... Oh, I'm sorry. Go ahead. Are you still going to stay on this issue? Well, let's go on to another issue. The issue, what happened was at some point the prosecutor put in prior bad acts that really weren't prior bad acts. They were subsequent acts. And you're submitting in your brief that it was improper to allow that in. Why was that not relevant? Well, because, first of all, I think he did this on his cross-examination, a redirect of Ms. Bishop. And I don't believe that was raised in the cross-examination except for he was a good father to this child, to Dustin. What they brought in, in my opinion, was it was collateral impeachment regarding a totally separate incident regarding her child. And I'm thinking Mr. Mahoney actually tried to cross-examine on this and indicated it was between her ex-husband and him, not the child. But I think what it just did is it attempted to muddy up the waters and bring in evidence of things regarding a child that wasn't a subject of this matter. And although the court acknowledged he did indicate he didn't take that into account. On the ruling on the motion to reconsider, he said he didn't consider it. That's correct. That's correct. And so to the extent that that, I'm going to rely on my brief for the argument in that regard. But at the time when it happened, it was our position it was improper as well. And I think he did consider it, and then he took it into account because he said, for whatever weight it is, I will consider that. He lied again. He did. And he said it will go to the weight, that's all. And then it did make that ruling at the end, I acknowledge that. But going back to the other, I do believe that the circumstances in this case, they are not what is envisioned by the statute. I don't think there is sufficient evidence to show he intended to conceal or remove this child in the manner in which it's prohibited by the statute. If we were to follow your suggestion, then each case would be unique. Even though on its face the elements appear to be satisfied, we'd have to look and see whether or not the legislature intended the law to be applied to this set of facts. Because you just earlier, you acknowledged that the judge did find that, but here's your position. On its face, he comes in, 1.30 in the morning, the agreement is to take the child to breakfast. He says it didn't have to be this way. A one-and-a-half-year-old child taken out of his bed at 1.30 in the morning without clothing, all he has on is his pajamas, takes him in a truck and drives off. Those are the facts, and all the other evidence you're suggesting shows that, yes, okay, that happened. But we should not affirm because the General Assembly did not intend the law to be enforced in this way. That's your argument, correct? That is one argument, that's correct. But with respect to the actual facts, just because Judge Hallock accepted certain testimony doesn't mean it's reasonable for him to conclude that. That no other person would agree with him. And in these situations, and what Your Honor indicated before about how the situation would be different, I agree. In a family situation such as this, I think it has to be. That's why the statute has so many different nuances with respect to the different manners in which it applies. We have a lot of different definitions of family. He has to stay overnight, and he was told no. And he did not. Right. And the question then is... He came back at 1.30 in the morning, which is still midnight. I believe it's 3.30. And that's the question, too, Judge. There's no, and this is the state's burden to prove him guilty without reasonable doubt. And there was no evidence in there of what time he left or what time frame this all happened. It could have been 1.30 or 2.30, we don't know. And then he came back an hour later because he didn't want to go all the way back. There are a number of speculations. But my point is the facts that are here indicate that it was a situation similar to Morrison wherein he had access to the child, he was regularly in the child's life, he had regular seeing the child, had taken a break previously, and she has no problem with him being as a father or supporting him. There was no reason to believe, in her mind I would even say, that he was going to remove the child permanently as indicted by the statute. You bring up a good point. Is it relevant what was in her mind? No. But the facts and circumstances to a reasonable person would suggest that in light of all those things I just said, his relationship with the child and the facts as far as his supporting them and him being over there all the time and a 20-year relationship would lead a reasonable person to believe that this isn't that abnormal, that this is a situation where he wasn't intending to take this child and remove it from the mother other than as they agreed for the breakfast. And the fact that he called them afterwards supports that conclusion as well. The fact that he returned them within 10 minutes of speaking to her supports that as well. As far as the statement that it didn't have to be this way, it could have exactly meant what you and I brought up, that he wanted to stay there. If I would have stayed here, I wouldn't have had to come back this early to do this. Those statements can be attributed in a different way other than something more negatively, I guess I would say. So based on all of that, I believe the court, you're right, found that she did not consent, but he never addressed the intentional element either. He was knowingly taking the child away. And that's not what the statute requires. It does require intentionally. And they are different levels. And so to the extent that that's the case, and, again, looking at that, did my client have intent in light of all those factors I just talked about before? The fact that they had a 20-year relationship, the fact that he was there all the time, the fact that he supported them and he would be there regularly with this child. Do those facts support the fact that my client intended to remove them as envisioned by the statute? I don't believe it does. And, again, the time frame in which it was, it was only a few hours, the fact that he tried to call, all those things support the conclusion he didn't have the intent to violate the statute as it's reasoned. There was, just so it's clear, there was no court order other than establishing paternity. There was no court order for visitation, custody, or anything, correct? No. And, in fact, I think the only establishment of paternity was the fact that he had signed the birth certificate  Thank you. Thank you. Thank you. Good morning, Your Honor. Good morning. Any trier fact that has found the essential elements of this child abduction beyond a reasonable doubt, especially in the light most favorable to the prosecution, we don't have to leave our common sense at the door. This was clearly an angry person who was trying to get back at his, I don't know, girlfriend by taking the child. As you already asked, you know, 3.30 in the morning, that's not usually a time someone takes a child out in the middle of January in his pajamas, no coat, just barges in, goes into the bedroom, picks the child out of the bedroom, goes right back out into the freezing cold, and gets in his truck. We don't know if he even had a child seat in that truck. There definitely was intent. This was shown by... Intent for what? Intent to take the child. For how long? It doesn't matter. Obviously, if he wanted to take it for two hours a day, no one knows that. But he had the intent to take. Did he call her and she not answer the phone? That's when the police were there, I guess, and she said the phone rang and it's not... Well, he wouldn't know the police were there, would he? He wouldn't have known the police were there. No, he wouldn't have. But that was several hours later. How do we know how many hours later it was? Well, I think she called the police. I mean, it could have been... How long after he left with the baby did she call the police? I think, from what I see from the record, it's not clear, but it seems like she called right away. So while the police were there, he called her. So he must have called her right away, too, right? No, that's not in the record. It seems like they were there for quite some time. And then he called, but it doesn't seem like he brought this child back for a few hours at least. Now, it's clear he was angry at that time. The point, I think, is that there's no duration in the statute. There's no duration, no. I mean, at the time, he had the intent to abduct this child. Well, doesn't duration lend itself to the intent? If he would have taken the child and went out for five minutes and came back, doesn't that affect the intent? I think it might in that case, but that's not the case we have here. But here, we have the fact that she told him, when they did speak, to bring the child home, and he did immediately. Isn't that correct? That is correct. But this was a few hours later, and that has nothing... I'm sorry. No, go ahead. That has nothing to do with his intent at that time. This was where the mother was saying, this is a man who gets very angry very quickly. You can interpret that as someone who loses their temper, goes in. He obviously had the intent when he said it didn't have to be this way. He goes in there at that specific time. He definitely has intent. Well, so where do we draw the line in terms of the time frame then? I mean, don't we have to, as was argued earlier, take all of the circumstances here into account? The fact that he returned the child, that he tried to call her, the fact that she never called him. Right. So I think all of that doesn't... Otherwise, what if we're talking about an hour? I mean, where do you draw the line in terms of the time frame and how that would impact the issue of intent? So aren't these other circumstances in that case important? Well, of course they're important, Your Honor. But the fact is, I think if you're going to be clear, I would argue that it's the intent right at the time of the taking. So if he had walked out the door, put the child in the car, but then didn't drive away and walk back in the house, we still would charge him with child abduction because right at the moment he walked out of that house, his intent was, I'm taking that child. I think that is the correct interpretation. Now, if you look at other circumstances, that might, you know... That's a charging decision at that point in time. Is the state going to go forward with the prosecution? Or something that they did. Well, they did here, correct? Correct, yes. Well, let me ask you this. Your opponent, Mr. Gibbs, talked about the intent of the legislature. If we don't try and interpret some intent on each case specifically, aren't we giving some angry mother or father, in a bad divorce situation or parental situation, car blinds just to pick up the phone and call the police and say, oh, he took my son or she took my child? I mean, don't we have to look at what the legislative intent was in order to cut through some of the animosity that you get in these family cases? I think if they bring up the fact that the statute is unconstitutional and it's applied, this wasn't done in this particular case. And I think, no, once you have the statute has been found facially valid, you have to look at it as facially valid. Now, if we have certain circumstances and it's applied, maybe there's a change, like what happened in Morrison. How is Morrison different? Why is this case not like Morrison? How do you distinguish? Oh, well, in Morrison, the parents lived like married people. The father was there every morning. He was contributing to the support of the child continuously, uninterrupted. Continued, uninterrupted. In this case, we have no evidence that that was the case. You know, the mother said, well, he's been a pretty good dad. He shows up, you know, she said five, you know, days every other day. Five or six times a week. Sometimes five to six times a day or five to six times a week. But how long? Is he there for breakfast? Is he there for dinner? Is he, you know, is he changing the child's diapers? What's that relevant? Well, it's relevant because you're part of a married, you know, committed couple. Do you think every husband changes diapers? Nowadays they do, I think. I don't know. How about when she says my concern was our issues, not so much with him being with the child? Does that have anything to do? That has nothing to do with his intent. His intent was to take that child with that time. Without consent. Without consent. She said they, you know, they brought up the fact, well, you know, why didn't you say something? Why didn't you stop him? Well, number one, because he gets very angry. I think there was some fear there. Number two, she said it just caught her off guard. Here's someone knocking at her door at 3.30 in the morning. Well, I mean. She opened the door. Pardon? She opened the door. We don't know if she saw who was out there or who said, I mean, we don't have that information. But the fact of the matter is she opened the door and saw him. Correct. She didn't close the door in his face and say, you know, get out. Well, and there's some kind of, this relationship obviously has its ups and downs. She knows the person. He may have been knocking at the door for some other reason, for some emergency. Obviously, she cares for him at least as her child's father. But the other thing she also said is, you know, I didn't know what to do. I was half asleep. It kind of shocked her. But she immediately called the police. It was clear. Immediately right at that point? Well, that's my, you know, they called the police. They did not narrow it down in the records. So that's kind of a question, isn't it? Well, it's a little bit of a question. You know. Is there any, was there any evidence offered that she was trying to get back at him for anything? No, I don't think so. There was no child support? There was no family matters? No, no issues. No issues like that. There was no peripheral divorce proceeding that she had to enacts against him? No, no. And there was no evidence of them having an argument the night before, just besides the fact that he wanted to stay overnight and she said no. I guess that's an indication of that upset him and that made him angry that he is kind of a volatile person. But, again, we don't know if he provided support, uninterrupted support. He was never adjudicated legally as the father. So he has, I think, less rights under the statute. But she treated him as the father from what we see in the record. Sure. By giving him access to the child and accepting him as at least a visitor in the home. Well, yeah. And in that case, I think, as far as the child goes, they did act as adults, which is nice in, as you know, many divorce situations. The parents don't act mature. They acted as adults and they acted as parents to the child. As parents, right. That's right. And, finally, again, he wasn't living with the mother like in Morris. Could you briefly address the other crimes issue? Well, on cross-examination, defense counsel did ask. He was trying to make the defendant out into a model father. And he specifically asked the witness if the defendant had ever threatened any of her other children. And she denied that. And that is why, you know, on cross-examination, or this was done on cross-examination, I redirect. The state has a right to clarify that. You know, that's a very unfavorable inference for us or impression that this guy was an angel. I think we have a right to rebut that. And, besides that, if your honors don't agree with that, the judge said it. You know, he let it, he says, we're what it's worth. And then, you know, after that he said, I didn't even think, you know, I didn't use this at all. It wasn't part of my thoughts when I made this decision. So it's really harmless, you know, nevertheless. Although I still think we had that right to bring in that police report. And for what purpose? Well, to show that they tried to introduce evidence of good character. And this was evidence of bad character. Correct. If your honors have no more questions, I think we've covered pretty much everything. Thank you. Mr. Gibbs. Some of the questions that were asked of counsel regarding the timeline. I think there are some things in the record that reference that. This phone call was made by my client to Ms. Bishop about an hour and a half after he left. And the police were there at that time. Yeah, we do not know when she called them. But the fact that they were there an hour and a half later would suggest it wasn't immediately. Why would he be calling her? To tell her where he is, when he's coming home, touching base. Aren't those the kind of arrangements that should have been made when he took the child? If he was taking the child with consent, he would have said, I'll be back at X and we're taking the child. Instead of just rushing out of the house. You see what I'm saying? I do. It cuts both ways. He calls her, you know, she's still the middle of the night, 5 o'clock or not middle of the night. I understand that. And I think as it gets back to what I was just going to address, I can answer that question with this as well. We talked about when, did he have the intent at the time of the taking. One of your honors asked that. And the intent he had at the time of removing the child would have been to have his visitation. And that would be supported by him calling her back an hour and a half later. And the fact that he makes the comment, it didn't have to be this way. And as I indicated, there are many ways to take that. One could be, I could have come back later, but I'm going to take my visitation now. So again, you're talking about the inferences that you draw from the evidence as opposed to the inferences the trial court drew from the evidence. And I think that, yes, and I think in light of all the things that I've said and all the other factors, that is a more, that's reasonable in light of the evidence. Whereas I don't think his conclusions in light of everything were reasonable. No reasonable fact finder could have taken the opposite view. It has to be your position. Exactly. In light of everything. And as I indicated before, I think that he can take something and take it as his own and still it wouldn't be reasonable. Mr. Gibbs, I have a couple questions for you, sir. Did she, in that hour and a half before he called, did she try to call him? No. In that hour and a half that he was gone, did the police officers ever call him? There's nothing in the record to that effect, no. In fact, the only officer that testified was Officer Bennett. And I think he said he was on the scene around 4-ish. I think that's what it was. And we don't know if that was the only one there or if that was the person that was there when he called. We don't know. And he never reached out to your client? No. And then no evidence of that anyway when he testified. And my client, there's no evidence my client even knew they were there when he called. And that goes to support my conclusion that he was only taking them for the visitation. He was doing the right thing as far as the situation is concerned. That's all I have. Thank you. Thank you. Thank you. At this time, the Court will take the matter under advisement and render a decision in due course. We stand in recess until the next case.